IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| DR. JUDITH LOUISE MARLEY, | ) Civil Action No. 3:08-937-CMC-JRM |
| Plaintiff, | ) |
| vs. | ) |
| THE UNIVERSITY OF SOUTH CAROLINA; | ) |
| SAMANTHA HASTINGS; | ) **REPORT AND RECOMMENDATION** |
| CHARLES BIERBAUER; | ) |
| ANDREW SORENSON; AND | ) |
| MARK BECKER, JOINTLY, SEVERALLY, | ) |
| AND IN THE ALTERNATIVE, | ) |
| Defendants. | ) |

Plaintiff, Dr. Judith Louise Marley ("Plaintiff") filed this action on March 19, 2008. On January 6, 2009, Plaintiff filed an amended complaint ("AC"). She alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII"); the Americans with Disabilities Act, 42 U.S.C. § 12101, et seq. ("ADA"); the Equal Pay Act, 29 U.S.C. § 206(d) ("EPA"); 42 U.S.C. § 1983 (§ 1983); and the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO").[1] Additionally, she alleges numerous claims under South Carolina law. The University of South Carolina ("University") filed counterclaims[2] alleging Plaintiff refused to return University property and failed to repay moneys paid to her during a period she did not perform work for the University. Defendants filed a motion to dismiss and for summary judgment on August

---

[1]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

[2]No dispositive motions have been filed as to the counterclaims.

31, 2009. Plaintiff filed a response on October 2, 2009, and Defendants filed a reply on October 19, 2009.

## STANDARD FOR MOTION TO DISMISS

When considering a 12(b)(6) motion to dismiss, the court must accept as true the facts alleged in the complaint and view them in a light most favorable to the plaintiff. <u>Ostrzenski v. Seigel</u>, 177 F.3d 245, 251 (4th Cir. 1999). The United States Supreme Court recently stated that "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " <u>Ashcroft v. Iqbal</u>, __ U.S. __, __, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting <u>Bell Atlantic Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Id.</u> Although "a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations," a pleading that merely offers "labels and conclusions," or "a formulaic recitation of the elements of a cause of action will not do." <u>Twombly</u>, 550 U.S. at 555. Likewise, "a complaint [will not] suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancements.'" <u>Iqbal</u>, __ U.S. at __, 129 S.Ct. at 1949 (quoting <u>Twombly</u>, 550 U.S. at 557).

## SUMMARY JUDGMENT STANDARD

When no genuine issue of any material fact exists, summary judgment is appropriate. <u>Shealy v. Winston</u>, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the evidence must be viewed in the light most favorable to the non-moving party. <u>Id.</u> Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. <u>Ballinger v. North Carolina Agric. Extension Serv.</u>, 815

F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. at 247-48).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra. Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir.

3

1993) and <u>DeLeon v. St. Joseph Hospital, Inc.</u>, 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. <u>Martin v. John W. Stone Oil Distrib., Inc.</u>, 819 F.2d 547 (5th Cir. 1987) and <u>Evans v. Technologies Applications & Servs. Co.</u>, 80 F.3d 954 (4th Cir. 1996).

## **FACTS**

1.  Plaintiff, who has a doctorate in Library and Information Science, applied for an assistant professor position in the University's School of Library and Information Science ("Library School").  Plaintiff Dep. 17, 19-20, D. Ex. 1.

2.  On April 1, 2004, the University offered Plaintiff a tenure-track, assistant professor position, which had a nine-month salary of $50,000.  Plaintiff Dep. 21, D. Ex. 4.

3.  During the same time period, the University also offered Jimcook Kim ("Kim"), a Korean national, an assistant professor position in the Library School.  <u>See</u> DEF00005.  The University boosted Kim's salary offer to $53,000 on June 16, 2004.  He was also offered $2,500 in moving expenses.  <u>See</u> DEF00005 and DEF00008 (Attachment to Plaintiff's Opp. Mem.).

4.  The duties of an untenured assistant professor consist primarily of teaching, scholarship or research, and service.  The tenure process generally takes six years.  Bierbauer Dep. 23.

5.  Plaintiff began working at the University in August 2004.  During her first two years, her immediate supervisor was Dr. Daniel Barron ("Barron").  From August 2006 until her employment with the University ended in May 2008, she was directly supervised by Defendant Dr. Samantha Hastings ("Hastings"), who replaced Barron.  Barron and Hastings

were supervised by Defendant Charles Bierbauer ("Bierbauer"), Dean of the College of Mass Communications and Information Studies.  Plaintiff Dep. 23 and 29, D. Ex. 7.

6.      The Library School's Tenure and Promotion Committee ("the Committee"), whose membership consisted of tenured, faculty colleagues, annually reviewed Plaintiff's performance.  The purpose was to give each faculty member an idea of how he or she was performing at the University.  Assistant professors generally do not formally apply for tenure and promotion until their sixth year.  Plaintiff Dep. 31, 55; Bierbauer Dep. 163.

7.      The rating categories given are unsatisfactory, fair, good, or excellent.  Bierbauer stated that if the end rating were good or lower, an assistant professor would not meet the criterion for promotion.  He stated that the Tenure and Promotion Guidelines specify that for promotion and tenure, a faculty member must achieve excellence in teaching.  Bierbauer Dep. 24-25.

8.      In her first-year review (2004-2005), Plaintiff received a rating "at or very near the required level of excellence" based on the "limited data" available to the Committee.  The Committee rated Plaintiff as having "good production of scholarly work" and "good" service.  Plaintiff Dep., D. Ex. 9.

9.      In her second-year review (2005-2006), with regard to teaching, the Committee commented:

> The student evaluations are of mixed quality.  The Committee strongly recommends that you review the suggestions in the student evaluations regarding feedback to students in your courses...The Committee reminds you that the tenure and promotion criteria require excellence in teaching in order to receive tenure and to be promoted.  In the opinion of the committee, your current teaching record, would not meet the [Library School] criteria for tenure and promotion.

Plaintiff Dep., D. Ex. 10.  With regard to scholarship, the Committee urged Plaintiff:

> to give high priority to increasing your scholarly productivity in the next year, with an emphasis in refereed articles in top-tier journals in our areas of

expertise. This is particularly urgent if you wish to make this an area of excellence according to [Library School] criteria for tenure and promotion. Id.

10.   Plaintiff taught some courses that were completely long-distance and online, while others also had in-studio students. She taught classes within the Library School from the fall of 2004 until the spring of 2006. Plaintiff Dep. 23-26.

11.   Plaintiff was assigned as a co-investigator on a $50,000 grant the University received from the United States Government. The subject grant was to provide workshops to librarians who serve communities around the State of South Carolina. Prior to the summer of 2006, Plaintiff discovered and reported to Bierbauer what she perceived as grant fraud based on certain tasks not being completed or the untimely completion of the grant tasks. See AC, Paras. 38-45.

12.   Plaintiff was scheduled to teach a class in the summer of 2006. On the evening of Friday, May 26, 2006, she sent an email to Barron informing him that she would not be able to teach the assigned class (to begin on Tuesday, May 30, 2006) because she was experiencing health problems and had been seen by her physician, Dr. Rachel Hall. Plaintiff Dep. 33, D. Exs. 13 and 88 (p. 2).

13.   A replacement was found, and Plaintiff did not teach that summer. Plaintiff Dep. 33.

14.   In June 2006, Plaintiff submitted a memorandum to Bierbauer and others entitled "Decisions Regarding My Position at The University of South Carolina." Plaintiff Dep., D. Ex. 16. Her memorandum provided, in part:

> This past weekend, I received a phone call from my brother informing me of several sudden, serious issues related to his own health...and the health of my eighty-six-year-old father (return of diabetic and heart-related problems). My brother has now asked me to move closer to my father, who lives in Hazleton, Pa. After much consideration then, I have decided to relocate to Hazleton, Pa sometime on or after September 1, 2006.

Plaintiff proposed to the University that she be appointed as "E-Assistant Professor" or "Senior E-Lecturer" and work "via e-connections" from Pennsylvania. She also stated that:

> [i]n any case, no matter when USC's final decision is made, I will need to spend the final two weeks of August (August 4-August 31) packing and moving things out of my office in Davis College [at the University].

Plaintiff Dep., D. Ex. 16.

15. In letter dated June 21, 2006, Bierbauer declined Plaintiff's proposal to work as an "E-Assistant Professor" and construed Plaintiff's memorandum "as indication of [her] voluntary resignation as [she] will not be able to fulfill [her] faculty obligations for the Fall 2006 semester," given that the new academic year would begin on August 16, 2006. Plaintiff Dep., D. Ex. 17.

16. On June 22, 2006, Plaintiff replied that Bierbauer had misinterpreted her memorandum and she did not intend it as a voluntary resignation. She said that the purpose was to communicate that she "may not be physically able to undergo third-year review as scheduled in October of 2006." Plaintiff Dep., D. Ex. 18.

17. In July 2006, Plaintiff applied for paid, extended disability leave. Her physician, Dr. Blake Moore ("Moore"),[3] represented that Plaintiff's disability began in late May and was anticipated to end on August 15, 2006. Plaintiff Dep., D. Ex. 24 (p. DEF02188). In late July, Dr. Moore informed a third-party that Plaintiff would not be able to return to work until "mid-August or early September." Plaintiff Dep., D. Ex. 26. The University denied Plaintiff's application for leave on the basis that, as a nine-month faculty member, Plaintiff was not eligible for paid disability leave. Plaintiff Dep., D. Ex. 25.

---

[3]Plaintiff later married Dr. Moore. See Plaintiff's Dep. 86.

18.   On August 16, 2006, Plaintiff reported to work at the University and gave Bierbauer and Hastings a note from Dr. Moore that stated that Plaintiff "should be considered medically cleared to return to work effective 8/16/06 with no limitations." Plaintiff Dep., D. Exs. 27-28. The University provides that because it had not received information earlier that Plaintiff would, in fact, return and be medically cleared to work, it had made arrangements for others to teach Plaintiff's Fall 2006 courses. Bierbauer Dep. 142; Plaintiff Dep., D. Ex. 17. When Plaintiff returned to work, she was assigned non-teaching responsibilities, which consisted of revising, updating, and reformatting three courses to web-based formats. Plaintiff Dep. 50, D. Ex. 29.

19.   Plaintiff was assigned teaching duties for the Spring 2007 semester. Hastings states that he received complaints from at least twenty students in Plaintiff's web-based, distance-learning course about poor teaching by Plaintiff. Hastings Dep. 122, 125; see Plaintiff Dep. 116.

20.   On March 13, 2007, Hastings emailed Plaintiff and asked her about these concerns. Plaintiff did not respond. Plaintiff Dep. 77-78, D. Ex. 48.

21.   On March 26, 2007, Hastings wrote to Plaintiff:

> I have received emails from students regarding your class, 746. The students have not received graded assignments nor do they have current or future assignments to work from. They also say they have repeatedly emailed you and called you but your voicemail is full and you don't answer their emails. What is the status of this course?

Plaintiff Dep., D. Ex. 50. Plaintiff did not respond. Plaintiff Dep. 77-78, 80.

22.   Hastings informed Plaintiff that the University was removing her from the two courses she was teaching that semester. Plaintiff Dep. 85-86, D. Ex. 52.

23. At the University, the third-year review is considered to be the "make or break year" where "your tenured colleagues decide whether or not they wish to continue having you as an untenured colleague." Plaintiff Dep. 55. In preparation for the annual review by the Committee, each candidate must submit a file. Plaintiff had been reminded one year earlier, during her second-year review, that she should prepare her third-year file with "great care." Plaintiff Dep., D. Ex. 10.

24. Shortly before her third-year file was due, Plaintiff emailed Hastings, and John Olsgaard, the Co-Chair of the Tenure and Promotion Committee, on February 28, 2007. She requested an extension of time until March 5, 2007 to submit her file because she was stranded in St. Louis for a couple of days and an electrical storm had "destroyed the hard drive on [her] laptop, including the tenure documents" she had stored there. Her request was approved. Plaintiff Dep., D. Ex. 35.

25. On March 5, 2007, Plaintiff requested another extension based on her previously-identified reasons and because she was experiencing pain in her hands. Hastings and Olsgaard extended the due date to March 15, 2007. Plaintiff Dep., D. Ex. 36.

26. Plaintiff did not turn in her complete third-year file, submitting only a peer review evaluation that two colleagues prepared and a statement regarding her philosophy of teaching. She did not submit the main component of the file. She claims she was not physically able to submit any other documents. Plaintiff Dep. 61-62, D. Ex. 43.

27. On March 8, 2007, Plaintiff submitted to Defendant Dr. Mark Becker ("Becker"), the University's Provost, an "Appeal for Extension on Third-Year Review Process." She requested an extension and represented that her physical challenges "may qualify" her for

accommodation under the ADA. The Provost's office stated that it would not take action on her request given that it concerned a departmental and college matter. Plaintiff's Dep., D. Exs. 38 and 39.

28. On March 9, 2007, Plaintiff wrote to Hastings, Olsgaard, and others requesting an indefinite extension of time to submit her entire third-year file. Plaintiff Dep., D. Ex. 40. Hastings granted an extension (until March 20, 2007) for Plaintiff to submit her file before the Committee's March 23, 2007 meeting. Plaintiff Dep., Ex. 42. Plaintiff never submitted her complete file. Plaintiff Dep. 61-62; Hastings Dep. 96.

29. On March 26, 2007, the Committee completed its third-year review. The committee found that Plaintiff's teaching, scholarship, and service were unsatisfactory and concluded that her overall third-year evaluation was "unsatisfactory." Hastings recommended against the University renewing Plaintiff's annual contract after the next year. Plaintiff Dep., D. Ex. 54.

30. On April 6, 2007, Bierbauer confirmed that Plaintiff would not be reappointed. Plaintiff Dep., Exs. 56 and 61. According to University policy, Plaintiff would "remain on the faculty for the subsequent year," so her appointment would end on May 15, 2008. Plaintiff Dep., D. Ex. 61; D. Ex. 98 (p. DEF02299).

31. Plaintiff appealed her non-reappointment to the Provost's office, which rejected her appeal, explaining that the Library School had, consistent with University policy, provided her written notice of her non-reappointment more than twelve months prior to the effective date of her termination. Plaintiff Dep., D. Exs. 59 and 62.

32.   She appealed to Defendant Andrew Sorensen ("Sorensen"),[4] then-University President. Sorensen denied the appeal on June 1, 2007. Plaintiff Dep., Ex. 68. Plaintiff grieved her non-reappointment to the University's Faculty Grievance Committee, which rejected the grievance. Sorensen affirmed the decision. Plaintiff Dep., D. Exs. 85 and 86.

33.   During the 2007-2008 school year, Plaintiff was not assigned to teach and instead had the task of preparing an online bibliography of required readings from all Library science courses. Her employment with the University ended in May 2008. Plaintiff Dep. 23, D. Ex. 79.

34.   In 2007, Plaintiff filed two charges of discrimination with the Equal Employment Opportunity Commission ("EEOC") alleging sex, disability, and pay discrimination against the University. After investigating the charges, the EEOC issued "no cause" determinations.

## MOTION FOR SUMMARY JUDGMENT

In her amended complaint, Plaintiff alleges claims for: (1) breach of contract; (2) breach of implied contract; (3) anticipatory breach of contract; (4) anticipatory breach of implied contract; (5) violations of the ADA; (6) violations of § 1983; (7) violations of the State Whistleblower Act; (8) civil conspiracy in violation of civil Rico; (9) tortious interference of a career; (10) intentional infliction of emotional distress; (11) negligent infliction of emotional distress, (12) unjust enrichment, (13) violations of the EPA, (14) violations of Title VII, and (15) wrongful termination. Defendants contend that their motion for summary judgment should be granted because: (1) Plaintiff fails to establish a severe and pervasive hostile work environment or any gender-motivated harassment; (2)

_____

[4]It appears that this Defendant's last name is incorrectly spelled in the caption of the complaint. See Plaintiff's Dep., Exs. 68 and 86.

there is no evidence of discriminatory animus on the part of the decisionmaker and the University had a legitimate, non-discriminatory reason for paying Kim a higher salary; (3) Plaintiff has presented no evidence of the existence of a six-year contract, a breach of such, or damages stemming from any breach; (4) the University provided Plaintiff with reasonable accommodations under the ADA; (5) Plaintiff has not shown a due process violation under § 1983; (6) Plaintiff does not meet the definition of an employee under the State Whistleblower Act and did not file a report under the Act; (7) Plaintiff has not established a RICO violation; (8) there is no cause of action for "tortuous interference of a career" under South Carolina law and such a claim is barred by the South Carolina Tort Claims Act ("SCTCA"); (9) Plaintiff fails to establish a claim for intentional infliction of emotional distress and has other legal remedies that are grounded in the same facts; (10) Plaintiff's claim for negligent infliction of emotional distress is barred by the S.C. Workers' Compensation Act's exclusive remedy provision, is barred by the SCTCA, and fails on the merits; (11) Plaintiff fails to establish a claim for unjust enrichment; (12) Plaintiff fails to establish a claim for wrongful termination and has other statutory remedies; (13) Defendants are entitled to Eleventh Amendment immunity as to Plaintiff's ADA, RICO, and state law claims; and (14) academic decisions are not subject to judicial review such that the Court should decline to review Plaintiff's claims to the extent they challenge the University's academic decisions and do not allege discrimination.[5]

---

[5]Defendants contend that academic decisions are not subject to judicial review under Fourth Circuit law, such that her claims should be dismissed to the extent they challenge the University's academic decisions and do not allege discrimination. Specifically, Defendants argue that Plaintiff's state law claims (with the exception of the Whistleblower claim) and due process claims should be dismissed because they rest on the university's academic decisions. Plaintiff, without citing authority, merely argues that the decisions are subject to judicial review. Plaintiff's Opp. Mem. at 2.

A.     Title VII

Plaintiff alleges a disparate pay claim and a hostile work environment claim under Title VII.[6]

(1)     Title VII Harassment Claim (Count XIV)

Plaintiff alleges a claim under Title VII against the University for a sexually hostile work environment.  Defendants contend that they are entitled to summary judgment on this claim because the alleged harassment was not sufficiently severe or pervasive and was not based on her sex.

To prevail on a Title VII hostile environment claim based on sex, a plaintiff is required to present evidence establishing that "(1) the subject conduct was unwelcome; (2) it was based on the sex of the plaintiff; (3) it was sufficiently severe or pervasive to alter the plaintiff's conditions of employment and to create an abusive work environment; and (4) it was imputable on some factual basis to the employer."  Spicer v. Virginia Dep't of Corrs., 66 F.3d 705, 710 (4th Cir.1995) (en banc); see also Ocheltree v. Scollon Prods., Inc., 335 F.3d 325, 331 (4th Cir. 2003) (en banc).

In support of her allegations, Plaintiff claims that Hastings referred to her as "sweetie" or "baby" on four occasions, and on one occasion, Hastings hugged and touched her breasts.  Plaintiff's Dep. 147-148, 151, 158.[7]  She testified that while attending an out-of-state conference in January

---

[6]It is unclear whether Plaintiff asserts these claims against the individual Defendants. The Fourth Circuit, however, held that "supervisors are not liable in their individual capacities for Title VII violations." See Lissau v. Southern Food Service, Inc., 159 F.3d 177, 180 (1998).

[7]Plaintiff wrote a letter to Becker in September 2006 with the subject heading of "Appeal Regarding Unresolved Issues Associated with My Faculty Position at USC (Plus Attachments) Following Return from Illness During Summer, 2006.  On the fifth page of her letter, she includes the statement that she felt Hastings attempted to demean and humiliate her by referring to her as (continued...)

13

2007, Hastings came up to her and said, "Hi, you look great today in that green suit, sweetie"; embraced her; and as Hastings was breaking the embrace, Hastings' hands touched Plaintiff's breasts. When asked whether it was incidental contact, Plaintiff responded "I have no idea. I don't think it was intentional." Plaintiff Dep. 154.

Plaintiff fails to establish a Title VII hostile environment claim based on sex because she has not shown that the alleged harassment was sufficiently severe or pervasive to alter her conditions of employment and to create an abusive work environment and has not shown that the alleged verbal harassment was based on her sex. In the light most favorable to Plaintiff, Hastings referred to Plaintiff as "sweetie" or "baby" on four occasions and touched her breasts (which she was unsure was even intentional) while hugging her on one occasion. Courts have found behavior that is even more egregious than that described here insufficient to sustain a hostile work environment claim. See, e.g. Hopkins v. Baltimore Gas & Elec. Co., 77 F.3d 745, 747 and 753 (4th Cir. 1996)(affirming the granting of summary judgment to defendant on a sexually hostile work environment claim because the conduct, which included complaints that the harasser "bumped into him, positioned a magnifying glass over his crotch," stared at him in the bathroom, asked "whether he had sex with anyone," referred to genitalia, and kissed him, "was neither sufficiently severe nor sufficiently pervasive to create and environment that a reasonable man would find hostile or abusive."); Shaver v. Dixie Trucking Co., Inc., 181 F.3d 90 (4th Cir. 1999)[Table](holding that placing a hand on the plaintiff's knee, rubbing the plaintiff's back, and two hugs initiated by the alleged harasser did not constitute a hostile working environment where, at the time of the touching, the alleged harasser did not make

_____

[7](...continued)

"sweetie" several times. Plaintiff's Dep., Ex. 33.

any sexually suggestive remarks or touch or attempt to touch plaintiff in any other manner); <u>Murray v. City of Winston-Salem, North Carolina</u>, 203 F. Supp.2d 493, 498-99 (M.D.N.C. 2002)(finding no objectively hostile work environment where the supervisor yelled at plaintiff during meetings and had an intimidating management style, made comments about his past sexual encounters and rotated his pelvis, put his arm around plaintiff after a meeting in which plaintiff cried, made a comment about how plaintiff looked in jeans, briefly touched plaintiff's thigh twice with his thumb during a crowded meeting, and made "ummm" noises and stared at plaintiff when she walked past him); <u>Raley v. Board of St. Mary's County Comm'rs</u>, 752 F.Supp. 1272, 1275 and 1280)(D.Md. 1990)(plaintiff failed to show that supervisor's harassment of her was sufficiently severe or pervasive to create an abusive work environment even though she experienced "various offensive touchings and other sexual innuendos," including an occasion where he "uninvitedly placed his hands on [the plaintiff's] thigh underneath her dress"); <u>see also</u> <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238 (11th Cir.1999)(found that no sex-based hostile work environment existed where the plaintiff complained that her supervisor rubbed his hip against her while touching her shoulders, stared at her, followed her constantly, and made inappropriate gestures while staring at her groin); <u>Quinn v. Green Tree Credit Corp.</u>, 159 F.3d 759, 768 (2nd Cir. 1998) (finding supervisor's statement that plaintiff had the "sleekest ass" in the office plus single incident of "deliberately" touching plaintiff's "breasts with some papers that he was holding in his hand" were insufficient to constitute severe or pervasive actions that altered the terms or conditions of the plaintiff's employment); <u>Weiss v. Coca-Cola Bottling Co. of Chicago</u>, 990 F.2d 333, 337 (7th Cir.1993) (granting summary judgment for defendant on plaintiff's sexual harassment claim where supervisor repeatedly asked plaintiff about her personal life, told plaintiff how beautiful she was, asked plaintiff on dates, called her a dumb blonde, put his hand on her shoulder at least six

times, placed "I love you" signs in her work area, and tried to kiss her once at a bar and twice at work);

Further, Plaintiff fails to show that the alleged harassment was based on her sex. Plaintiff testified that she witnessed Hastings call male colleagues "sweetie" and on two occasions hug male employees. Plaintiff's Dep. 152. As Hastings purportedly treated Plaintiff the same as male employees, Plaintiff fails to establish that Hastings' actions or words were motivated by Plaintiff's gender. See Lack v. Wal-Mart Stores, Inc., 240 F.3d 255, 262 (4th Cir. 2001)(reversing jury verdict because the plaintiff "failed to demonstrate gender-based harassment," where the alleged harasser was vulgar to males and females and the plaintiff had not offered evidence that the harasser's conduct "was not just sexually tinged harassment, but was instead harassment because of sex").

### (2)    Title VII Pay Claim (Count XIII)

Plaintiff alleges a claim for disparate pay under Title VII.[8] Defendants contend that Plaintiff fails to establish her claim because she has not shown evidence of discriminatory animus on the part of Dean Bierbauer. They argue that even if Plaintiff can establish her prima facie case, that they have articulated a legitimate, non-discriminatory reason for the pay difference.

To establish a prima facie case of wage discrimination under Title VII a plaintiff must show that: (1) she is a member of a protected class; (2) she was paid less than an employee outside the class; and (3) the higher paid employee was performing a substantially similar job. Brinkley-Obu v. Hughes Training, Inc., 36 F.3d 336, 343 (4th Cir. 1994); Kess v. Municipal Emps. Credit Union

---

[8]She also alleges an EPA claim, discussed below. Title VII and the EPA can be construed harmoniously, though there are some differences between the statutes. Reece v. Martin Marietta Techs., Inc., 914 F. Supp. 1236, 1240 (D.Md.1995). For instance, unlike the EPA, Title VII requires a showing of discriminatory intent by direct or indirect evidence. McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973).

of Baltimore, Inc., 319 F.Supp.2d 637, 644 (D.Md.2004). If a plaintiff establishes a prima facie case, the burden of production shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. If the defendant articulates such a reason, the burden then rests on the plaintiff to come forward with evidence that the defendant's proffered reason for its actions is a mere pretext for impermissible discrimination. Brinkley-Obu, 36 F.3d at 344.

Plaintiff has established her prima facie case of disparate pay under Title VII because she has shown that she is a member of the protected class; that Kim, a person outside the protected class, was paid more than she was paid (Kim was paid $53,000 and Plaintiff was paid $50,000); and that she and Kim were performing substantially similar jobs. The University, however, has articulated a legitimate, nondiscriminatory reason for paying Kim more which Plaintiff fails to show is pretextual. Specifically, the University articulated that Dean Bierbauer believed, based on advice he received from the International Support office, that immigration law requirements mandated an offer of approximately $53,000 for Kim. Bierbauer later was informed that this minimum applied to assistant professors, but not to instructors (who could receive a lower minimum salary of $45,180), but this was after the increased salary was already offered to Kim. See Bierbauer Aff., Paras. 6-9; Carolyn Delton Aff., Paras. 5-7. Plaintiff acknowledged that the immigrations requirements that Defendants believed applied to Kim were the reason for the offer to Kim of a higher salary. Plaintiff's Dep., D. Exs. 72 and 74.

Plaintiff argues that the reason given is pretext for discrimination because Kim had not yet received his Ph.D. at the time he was hired or began working, was therefore not qualified to be hired as an assistant professor, and that by hiring Kim, the University violated the Immigration and Nationality Act by hiring a foreign national without first attempting to hire a qualified U.S. citizen.

17

Defendants, however, provide that it is common to offer assistant professor positions to doctoral candidates who have completed all but the required dissertation. They also provide that while the immigration requirement noted by Plaintiff is required for permanent visa holders, it is not required for temporary visa holders. Nevertheless, Plaintiff fails to show that the articulated reason for the salary difference is false, or that Plaintiff's sex was the reason for the salary difference.

In her memorandum in opposition to summary judgment, Plaintiff for the first time argues that she has shown a violation of Title VII because Kim was paid $2,500 in moving expenses that she was not offered. This claim, which was not included in the amended complaint, is not properly before the court. Further, Plaintiff fails to show that she exhausted her available administrative remedies as to any claim concerning moving expenses.[9] Even if it is considered, however, it appears only to affect Plaintiff's prima facie case in that it shows that Kim was paid more than she was paid. As noted above, Plaintiff has established her prima facie case. Further, Defendants have offered a legitimate, nondiscriminatory reason for offering Kim moving expenses, that he was making an international rather than a domestic move. Plaintiff has not shown that this reason is false or that her sex was the reason for offering Kim moving expenses.

B.    Equal Pay Act (Count XIII)

Plaintiff alleges that Kim was paid more than her in violation of EPA. Defendants contend that they are entitled to summary judgment as to these claims because there is no evidence

---

[9]"Only those discrimination claims stated in the initial charge, those reasonably related to the original complaint, and those developed by reasonable investigation of the original complaint may be maintained in a subsequent ... lawsuit." Evans v. Techs. Apps. & Serv. Co., 80 F.3d 954, 963 (4th Cir. 1996) (discussing Title VII: see also Dennis v. County of Fairfax, 55 F.3d 151, 156 (4th Cir. 1995) (If "the claims raised ... exceed the scope of the EEOC charge and any charges that would naturally have arisen from an investigation thereof, they are procedurally barred.") (discussing Title VII).

18

of discriminatory animus on the part of Dean Bierbauer and the University had a legitimate, non-discriminatory reason for paying Kim a different salary.

To establish a prima facie case under the EPA, a plaintiff must prove: "(1) that her employer has paid different wages to employees of opposite sexes; (2) that said employees hold jobs that require equal skill, effort, and responsibility; and (3) that such jobs are performed under similar working conditions." Brinkley v. Harbour Recreation Club, 180 F.3d 598, 613 (4th Cir.1999) (citing Corning Glass Works v. Brennan, 417 U.S. 188, 189 (1974)); see Reece v. Martin Marietta Techs., Inc., 914 F.Supp. at 1240 (D.Md. 1995).

Plaintiff has established a prima facie case under the EPA. The burden thus shifts to Defendants to prove that the pay differential is justified by the existence of one of the four statutory exceptions set forth in § 206(d)(1): (1) a seniority system; (2) a merit system; (3) a system that measures earnings by quantity or quality of production, or (4) a differential based on any factor other than sex. Strag v. Board of Trustees, 55 F.3d 943, 948 (4th Cir. 1995); Reece v. Martin Marietta Techs., Inc., 914 F.Supp. 1236, 1241 (D.Md. 1995). If the employer is unable to meet the burden of proving a defense, then the employer is liable for sexual discrimination in pay. Reece, 914 F.Supp. at 1241(citing Strag, 55 F.3d at 948).

Defendants appear to argue that the pay differential is justified under factor four above because they paid Kim more based on their understanding (even if wrong) that they had to pay him more based on the applicable immigration law. Once this burden is met by the employer, "the plaintiff's claim must fail unless the plaintiff can satisfactorily rebut the defendant's evidence." Strag, 55 F.3d at 948. Plaintiff appears to argue that she has rebutted this evidence because Kim did not yet have his Ph.D. and because immigration law required that the University show it could not find

qualified U.S. citizens for the position before offering it to Kim. Plaintiff has not shown that immigration law required this or disputed that it is common practice to offer positions to all-but-dissertation candidates. Her arguments, however, fail to rebut Defendants' evidence that it offered Kim a higher salary based on a factor other than sex and fail to show that the explanation given by the University for the pay differential was false.

    C.    <u>Eleventh Amendment Immunity</u>

Defendants contend that Plaintiff's ADA, civil RICO, and state law claims should be dismissed because they are barred by Eleventh Amendment immunity. Defendants contend that they are entitled to Eleventh Amendment immunity as to the claims identified above because Plaintiff pled that the University is "a State Institution" (AC at 2); the Fourth Circuit Court of Appeals and district courts within the Fourth Circuit have repeatedly held that state universities are entitled to Eleventh Amendment immunity; and application of the Fourth Circuit's test in <u>Ram Ditta v. Maryland Nat'l Capital Park and Planning Comm</u>., 822 F.2d 456 (4th Cir. 1987) confirms that the University is protected by Eleventh Amendment immunity. The individual Defendants argue that they are entitled to Eleventh Amendment immunity because claims against them in their individual capacities are in reality a suit against the entity of which they are officials or employees. <u>Kentucky v. Graham</u>, 473 U.S. 159, 166 (1985). In her opposition memorandum, Plaintiff merely argues that "Defendants do not enjoy any Constitutional immunity in the matter *sub judice*" (Plaintiff's Opp. Mem. at 2) and that the EPA does not violate the Eleventh Amendment (<u>id.</u> at 6). Defendants, however, have not argued that they are protected by the Eleventh Amendment as to Plaintiff's EPA claim. With the exception of her ADA claim, discussed further below, Plaintiff has presented nothing to dispute that Defendants are entitled to Eleventh Amendment immunity as to her civil RICO claim and state law claims.

20

D.    ADA (Count V)

Plaintiff appears to allege that Defendants violated the ADA because they failed to provide her with adequate accommodations to perform her job duties and terminated her based on her disability.  Defendants contend that they are entitled to Eleventh Amendment immunity as to Plaintiff's ADA claims.  They also argue that the University provided Plaintiff with reasonable accommodations.  In her opposition memorandum, Plaintiff appears to argue that Defendants are not entitled to Eleventh Amendment immunity under Title II of the ADA and that Defendants did not provide accommodations in a timely manner.  See Plaintiff's Opp. Mem. at 19-20 and 27.

It is unclear under which provision of the ADA Plaintiff brings this action.  Title I of the ADA prohibits discrimination against disabled individuals employment (42 U.S.C. §§ 12111-12117) and Title II of the ADA prohibits discrimination against disabled individuals as to public services (42 U.S.C. §§ 12131-12165).  See PGA Tour, Inc. v. Martin, 532 U.S. 661, 675 (2001).  Title II of the ADA, 42 U.S.C. § 12131, et seq., prohibits qualified individuals with disabilities from being excluded from participation in or being denied the benefits of the services, programs, or activities of a public entity. In her amended complaint, Plaintiff alleges that the University failed to provide adequate accommodations to perform her job duties, subjected her to reprisals and other inappropriate actions, and terminated her based on her disability.  AC at 20.  Plaintiff states that "Defendant U.S.C. is a State activity as defined under Title II of the ADA."  Id.  She, however, does

21

not appear to have made any allegations under Title II.[10]  Thus, the undersigned interprets Plaintiffs

ADA claims as claims under Title I.[11]

The University is entitled to Eleventh Amendment immunity as to any claims under Title I

of the ADA.  The Supreme Court has held that the Eleventh Amendment bars private suits against

states and their agencies for monetary damages under Title I of the ADA.  Board of Trs. of Univ. of

Ala. v. Garrett, 531 U.S. 356, 361 (2001).[12]

---

[10]There is a split among the United States Courts of Appeals who have considered whether employment discrimination claims against public entities are available under Title II.  See, e.g., Board of Trustees of Univ. of Ala. v. Garrett, 531 U.S. 356, 360 n. 1 (2001)(acknowledging split but declining to resolve whether "Title II of the ADA, dealing with the 'services, programs, or activities of a public entity,' 42 U.S.C. § 12132, is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject.") (citations omitted).

[11]Even if Plaintiff has asserted a claim under Title II, she has not established her prima facie case.  To establish a prima facie case under Title II of the ADA, a plaintiff must show that: (1) he has a disability; (2) he was either excluded from participation in or denied the benefits of some public entity's services, programs, or activities for which he was otherwise qualified; and (3) such exclusion, denial of benefits, or discrimination was by reason of his disability.  See Constantine v. George Mason Univ., 411 F.3d 474, 498 (4th Cir. 2005); Baird v. Rose, 192 F.3d 462, 467 (4th Cir.1999).

[12]It is unclear whether Plaintiff is attempting to bring her ADA claims against the individual Defendants.  Although the Fourth Circuit has not expressly ruled on whether supervisors are liable in their individual capacities for ADA violations, the Fourth Circuit, in Baird ex rel. Baird v. Rose, 192 F.3d 462 (4th Cir.1999), held that an ADA retaliation claim could not go forward against individual defendants "[b]ecause Title VII does not authorize a remedy against individuals for violation of its provisions, and because Congress has made the remedies available in Title VII applicable to ADA actions."  Id., at 472.  District courts in the Fourth Circuit have found that individuals are not liable for violations of the ADA.  See Shiflett v. GE Fanuc Automation Corp., 1996 WL 481082 at *5 (W.D.Va. July 23, 1996) (holding that only employers, not individuals can be liable under the ADA and dismissing plaintiff's claims under the ADA against individual defendants); Cortes v. McDonald's Corp., 955 F.Supp. 531, 536-38 (E.D.N.C.1996) (finding that an individual in a supervisory position may not be held personally liable as an "employer" under the ADA and dismissing Plaintiff's ADA claim against an individual defendant); Stephens v. Kay Mgmt. Co., Inc., 907 F.Supp. 169, 174 (E.D.Va.1995)(noting that the ADA defines "employer to mean an employing entity, not an individual" and holding that "individuals who do not independently meet the ADA's definition of 'employer' cannot be held liable under the ADA in the making of employment decisions of a plainly delegable character").                    (continued...)

Even if Plaintiff's ADA claims are not barred by Eleventh Amendment immunity, Plaintiff fails to establish a claim for wrongful termination because she has not shown that she was meeting her employer's legitimate expectations at the time she was terminated and has not shown that her discharge occurred under circumstances that give rise to a reasonable inference of unlawful discrimination.  See Haulbrook v. Michelin N. Am., Inc., 252 F.3d 696, 702 (4th Cir.2001).

Plaintiff has not shown that Defendants failed to reasonably accommodate her disability.  To establish a prima facie case for failure to accommodate a disability under the ADA, a plaintiff must show that: (1) she was an individual who had a disability within the meaning of the statute; (2) her employer had notice of her disability; (3) with reasonable accommodation she could perform the essential functions of her position; and (4) her employer refused to make such accommodations.  See Rhoads v. F.D.I.C., 257 F.3d 373, 387 n. 11 (4th Cir. 2001).

Plaintiff alleges that Defendants failed to reasonably accommodate her disability because they did not timely provide her with voice-activated computer software and failed to provide her with adequate graduate assistance.  AC at 20.  Defendants, however, provided her with the requested accommodations.  In July 2007, Plaintiff submitted a note from her physician suggesting that Plaintiff be provided with a voice-activated computer software program and a personal assistant/graduate student to help with her job tasks.  See Plaintiff Dep., Ex.  71.  Plaintiff was not working in the summer of 2007.  When she returned in the fall of 2007, the University provided the software and offered Plaintiff training on the software.  See Plaintiff's Dep. 100, Ex. 79, 80; Hastings Dep. 150.

---

[12](...continued)

To the extent that Plaintiff has asserted a Title II claim, she cannot bring such claims against the individual Defendants.  Title II of the ADA applies only to public entities.  The term "public entity," as defined by the statute, does not include individuals.  See 42 U.S.C. § 12131.

Plaintiff was also provided a graduate assistant who was assigned to help Plaintiff ten hours per week. Apparently, Plaintiff thought she should have been provided with more hours of graduate assistant help per week, but she did not even use the ten hours a weeks she was allotted. Specifically, Plaintiff testified that she only emailed her graduate assistant once to ask him how many responses he had received to an email message Plaintiff had posted. Plaintiff's Dep. 165-167. She never spoke with the graduate assistant, never met him, did not ask him to carry out any other task, and did not know how many hours he worked. Plaintiff's Dep. 165-168.

E.    <u>RICO (Count VIII)</u>

Plaintiff alleges that Defendants violated 18 U.S.C. § 1962(c) and § 1962(d). AC at 25-28; <u>see</u> Plaintiff's Opp. Mem. at 29-30. Defendants contend that they are entitled to summary judgment on Plaintiff's RICO claims because: (1) they are entitled to Eleventh Amendment immunity; (2) Plaintiff cannot show that Defendants received any income derived from a pattern of racketeering activity, (3) she fails to establish that each Defendant committed at least two acts of racketeering activity, (4) she has not shown that any alleged RICO violation proximately caused her injuries; and (5) her RICO conspiracy claim is barred by the intra-corporate conspiracy doctrine as all Defendants were employees or associated with the University at the time of the alleged events.

18 U.S.C. § 1962 provides, in part:

(c) It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

(d) It shall be unlawful for any person to conspire to violate any of the provisions of subsection (a), (b), or (c) of this section.

To state a claim under § 1962(c), Plaintiff must allege that "(1) a defendant person (2) employed or associated with (3) an enterprise, engaged in, or the activities of which affect, interstate or foreign commerce, (4) conducts or participates in the conduct of the affairs of the enterprise (5) through a pattern of racketeering activity." Sadighi v. Daghighfekr, 36 F.Supp.2d 279, 295-96 (D.S.C.1999) (citing 18 U.S.C. § 1962(c)); see also Sedima, S.P.R.L. v. Imrex Co., 473 U.S. 479, 496 (1985)("A violation of § 1962(c) ... requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity.").  Section 1962(c)  prohibits a person employed or associated with an enterprise from conducting that enterprise thorough a pattern of racketeering activity.  See Palmetto State Med. Ctr., Inc. v. Operation Lifeline, 117 F.3d 142, 148 (4th Cir.1997).  It is also required that "[t]he enterprise ... be distinct from the persons alleged to have violated § 1962(c)." Id.; see also New Beckley Mining Corp. v. International Union, United Mine Workers of America, 18 F.3d 1161, 1165 (4th Cir.1994).

Here, Plaintiff fails to show a violation of § 1962(c) because she has not shown that Defendants committed at least two acts of racketeering activity.  See 18 U.S.C. § 1961(5); International Data Bank, Ltd. v. Zepkin, 812 F.2d 149, 151 (4th Cir. 1987).  "The predicate acts must be related and must amount to or pose a threat of continued criminal activity." Palmetto State Med. Cntr., 117 F.3d at 148.  "Under Fourth Circuit caselaw, civil RICO liability is reserved...for ongoing unlawful activities whose scope and persistence pose a special threat to social well-being." SecureInfo Corp. v. Telos Corp., 387 F.Supp.2d 593, 614 (E.D.Va. 2005)(quotations and citations omitted).  Additionally, Plaintiff cannot sustain a RICO claim by asserting that Defendants took adverse actions against her for reporting alleged criminal activity (here the alleged grant fraud).  See Nodine v. Textron, Inc., 819 F.2d 347 (1st Cir. 1987)("[A]n employee discharged for reporting a

criminal violation of his employer lacked standing to sue that employer under the RICO Act [because t]he discharge was not "by reason of" the RICO violations alleged."). Plaintiff has also not established a violation of § 1962(c) as she has not shown that the enterprise is distinct from the persons alleged to have violated. As Plaintiff fails to show that Defendants violated § 1962(c), her charge of conspiracy to violate RICO pursuant to § 1962(d) is also without merit. See GE Inv. Private Placement Partners II v. Parker, 247 F.3d 543, 551 n. 2 (4th Cir. 2001).

     F.     § 1983/Due Process (Count VI)

     Plaintiff alleges that Defendants violated her due process rights by suspending her teaching duties, removing her from the assistant professor tenure-track position, and depriving her of approximately two years of teaching experience. Defendants contend that Plaintiff fails to establish a due process claim because she has not shown that she had a property interest in employment duties, she has not shown that Defendants arbitrarily and capriciously failed to exercise professional judgment, she received the minimal hearing to which she may have been entitled, Defendants are entitled to qualified immunity, and to the extent she alleges a substantive due process claim it fails because she has not shown the existence of a right that arises solely from the Constitution or that the individual Defendants did not exercise professional judgment.

     Plaintiff fails to establish a procedural due process claim as to her being removed from teaching duties because she has not shown that she had a protected property interest in being allowed to teach. The burden of showing a protectable property interest is on the plaintiff. See Board of Regents v. Roth, 408 U.S. 564, 579 (1972) (plaintiff failed to show "that he was deprived of liberty or property protected by the Fourteenth Amendment"). "[T]he constitutionally protected property interest in employment does not extend to the right to possess and retain a particular job or to perform

particular services." <u>Fields v. Durham</u>, 909 F.2d 94, 98 (4th Cir. 1990). As an untenured professor, Plaintiff has no right to a due process hearing concerning the non-renewal of his or her contract, unless it can be shown that a property interest exists by virtue of state law, an express written contract, or by the University's policies. <u>See</u> <u>Roth</u>, <u>supra</u>; <u>Temple v. Medical University of South Carolina</u>, No. 2:02-2104-18, 2004 WL 3317660 (D.S.C. Feb. 6, 2004).

Even if Plaintiff has shown a protected property interest, she fails to show that she was denied due process. Plaintiff was notified that she was not maintaining the standards of teaching set forth in the University and Library School guidelines and was made aware of the nature of the student complaints. Plaintiff Dep. 83-85, D. Exs. 50-52. She filed an appeal in which she had the opportunity to present her reasons why she thought the action was not justified. Plaintiff Dep. 83-85, Ex. 57. In April 2007, Plaintiff was informed that she would not be reappointed, would remain on the faculty for the subsequent year, and her appointment would end on May 15, 2008. Plaintiff Dep., Exs. 56, 61, 98 (p. DEF02299). Plaintiff appealed this decision. <u>See</u> Plaintiff Dep. Exs. 59, 62, 85, 86.

To the extent that Plaintiff is asserting a substantive due process claim, the claim fails because she has not shown the existence of a right arising solely from the constitution or that Defendants did not actually exercise professional judgement. <u>See</u> <u>Huang v. Board of Governors</u>, 902 F.2d 1134, 1142 and n. 10 (4th Cir. 1990).

G.   <u>State Law Claims</u>

As discussed above, Defendants have asserted that they are entitled to Eleventh Amendment immunity as to Plaintiff's state law claims. Even if Defendants are not entitled to

Eleventh Amendment, it is recommended that Defendants be granted summary judgment as to Plaintiff's state law claims, as discussed below.

(1)    Whistleblower (Count VII)

Plaintiff alleges that Defendants violated her rights under the South Carolina Whistleblower Act. South Carolina law provides:

> No public body may dismiss, suspend from employment, demote, or decrease the compensation of an employee of a public body because the employee files a report with an appropriate authority of wrongdoing. If the appropriate authority determines the employee's report is unfounded, or amounts to a mere technical violation, and is not made in good faith, the public body may take disciplinary action including termination. Any public body covered by this chapter may impose disciplinary sanctions, in accordance with its internal disciplinary procedures, against any of its direct line supervisory employees who retaliate against another employee for having filed a good faith report under this chapter.

S.C. Code Ann. § 8-27-20. Defendants contend that the Whistleblower Act does not protect Plaintiff as she is not an "employee" under the Act and did not file a "Report" under the Act. Additionally, Defendants contend that the University has articulated a cause "independent of the filing of a protected report" for its actions.

Plaintiff fails to show that she is an "Employee" under the Whistleblower Act. See S.C. Code Ann. § 8-27-10(2) and § 8-17-370(10)(excluding "teaching or research faculty, professional librarians, academic administrators, or other persons holding faculty appointments at a four-year post-secondary educational institution" from the Act). She has also not shown that she filed a "Report"[13] as defined under the Whistleblower Act. Additionally, Plaintiff cannot bring a claim

---

[13]"Report" means a written document alleging waste or wrongdoing that contains the following information:
(a) the date of disclosure;
(b) the name of the employee making the report; and

(continued...)

under the Whistleblower Act against the individual Defendants as claims under the Act may only be brought against the "employing public body." S.C. Code Ann. § 8-27-30.

(2)   Breach of Contract Claims (Count I-IV)

Plaintiff asserts four breach of contract (breach of contract, anticipatory breach of contract, breach of implied contract, and anticipatory breach of implied contract) claims. AC at 13-19. She appears to allege that she had a six-year contract with the University based on the University's appointment letter, the University's Faculty Manual, letters of recommendation, and student evaluations. Plaintiff's Dep. 108-109. Defendants contend that Plaintiff fails to establish her breach of contract claims because she has not presented any evidence to show that she had, as alleged, a "binding six year, full time employment contract" (AC at 13).

Under South Carolina law, in order to prevail on a breach of contract claim, the Plaintiff bears the burden of establishing the existence and terms of the contract, the Defendant's breach of one or more of the contractual terms, and damages resulting from the breach. Taylor v. Cummins Atlantic, Inc., 852 F.Supp. 1279, 1286 (D.S.C. 1994), citing Fuller v. Eastern Fire & Cas. Ins.Co., 124 S.E.2d 602, 610 (S.C. 1962). Plaintiff fails to show that she had a binding six-year, full-time employment contract. Her appointment letter merely states that the position was on a nine-month basis; was tenure track; and subject to the tenure, promotion, and other policies and procedures. Plaintiff Dep, Ex. 4. The Faculty Manual specifically provides that within the probationary period all faculty

---

[13](...continued)

(c) the nature of the wrongdoing and the date or range of dates on which the wrongdoing allegedly occurred. A report must be made within sixty days of the date the reporting employee first learns of the alleged wrongdoing.

S.C. Code Ann. § 8-27-10(4).

appointments are on an annual basis. The probationary period may be up to seven years. Plaintiff Dep., Ex. 98 (p. DEF02298-2299).

Even if Plaintiff could show that a six-year contract existed, she has not shown a breach of such contract. Neither the appointment letter or the Faculty Manual provides a guarantee that a faculty member will teach every semester or provide for short-term disability benefits. See Plaintiff Dep. Exs. 4 and 98. Plaintiff's allegation that the University breached her contract by terminating her in the summer of 2006 also fails. She notified the University two business days before the summer classes were to begin that she would not be able to teach. The University, which had already made arrangements for her to be paid for her summer work (see Plaintiff Dep., Ex. 19), terminated her summer course compensation (see Bierbauer Dep. 76, 79). A clerical error occurred such that the termination was processed as to her regular employment, rather than just her summer employment. Plaintiff Dep., Exs. 19 and 21. This resulted in Plaintiff's insurance benefits being cancelled. When Plaintiff brought the matter to the University, however, the University corrected the clerical error and reinstated Plaintiff's regular employment and benefits. Plaintiff Dep. 38-39, Exs. 19, 22, 23; Bierbauer Dep. 79. Plaintiff has also not shown any damages which resulted from the clerical error. To the extent that Plaintiff asserts contract claims against the individual Defendants, those claims fail. None of the individual Defendants were Plaintiff's employer or parties to any contract with her. See McKagen v. Windham, 38 S.E. 2, 4 (S.C. 1901)("In the absence of evidence of an unqualified intention of the parties to bind the officer, it is not to be presumed...that a public agent intends to bind himself personally...")(internal citation & quotation omitted); McGee v. F. S. Royster Guano Co., 39 F.R.D. 578, 580 (D.S.C.1966)("Where an agent enters into a contract for a known principal, while acting within his authority as such agent, he is not personally liable on

the resultant contract. The liability, if any, for a breach of such contract is that of the principal alone").

        (3)      <u>Tortuous Interference of a Career (Count IX)</u>

Plaintiff alleges that Defendants breached a duty of care to her by suspending her from her teaching duties, delegating her to menial tasks, retroactively changing two years of satisfactory grades in the progress of her associate professor tenure-track program to unsatisfactory, depriving her of short-term disability payments, depriving her of health insurance, depriving her of adequate and reasonable accommodation under the ADA, providing substandard pay, stripping away two years of teaching, stripping away her ability of becoming a tenured professor, and wrongfully terminating her. Defendants contend that they are entitled to summary judgment as to Plaintiff's claim of tortuous interference of a career because no such cause of action is recognized under South Carolina law, any such claim is barred by the SCTCA, and where statutory remedies such as Title VII are available, she cannot circumvent those statutes by asserting a novel tort claim.

Plaintiff fails to establish a claim for tortious interference with a career because she has not identified what duty of care was owed to her by Defendants. Additionally, her claims against the individual Defendants are barred by the SCTCA. S.C. Code Ann. § 15-78-30 and 15-78-200; <u>see</u> <u>Flateau v. Harrelson</u>, 584 S.E.2d 413, 416-417 (S.C. Ct. App. 2003).

        (4)      <u>Intentional Infliction of Emotional Distress (Count X)</u>

Plaintiff alleges that Defendants caused her severe emotional distress by retroactively reversing her earned passing grades, suspending her teaching and other core duties, terminating or denying her short-term disability payments, shunning her, denying her teaching experience, insulting her, and taking reprisal actions against her. AC at 31. Defendants contend that

they are entitled to summary judgment on this claim because Plaintiff cannot bring a claim for intentional infliction of emotional distress where she has other legal remedies that are grounded on the same facts and because the conduct at issue was not so extreme and outrageous to support such a cause of action.

South Carolina expressly recognized the cause of action of intentional infliction of emotional distress, sometimes referred to as "outrage," in Ford v. Hutson, 276 S.E.2d 776 (S.C. 1981). To recover under the tort of outrage, a plaintiff must establish the following elements:

> (1) the defendant intentionally or recklessly inflicted severe emotional distress or was certain or substantially certain that such distress would result from his conduct;
>
> (2) the conduct was so "extreme and outrageous" as to exceed "all possible bounds of decency" and must be regarded as "atrocious, and utterly intolerable in a civilized community";
>
> (3) the actions of the defendant caused the plaintiff's emotional distress; and
>
> (4) the emotional distressed suffered by the plaintiff was "severe" so that "no reasonable man could be expected to endure it."

Id., at 778 (quoting Vicnire v. Ford Motor Credit Co., 401 A.2d 148 (Me. 1979))(internal citations omitted); see also Wright v. Sparrow, 381 S.E.2d 503, 505 (S.C. Ct. App. 1989). In considering the defendant's motion for summary judgment, the court must initially determine whether the conduct complained of "'may reasonably be regarded as so extreme and outrageous as to permit recovery, and only where reasonable persons may differ is the question one for the jury.'" Holtzscheiter v. Thomson Newspapers, Inc., 411 S.E.2d 664, 666 (S.C. 1991), overruled on other grounds, 506 S.E.2d 497 (S.C.1998)(quoting Todd v. South Carolina Farm Bureau Mut. Ins. Co., 321 S.E.2d 602, 609 (S.C. Ct. App. 1984), quashed on other grounds, 336 S.E.2d 472 (S.C. 1985)); see also Barber v. Whirlpool Corp., 34 F.3d 1268, 1276 (4th Cir. 1994) ("It is the court's responsibility to first

32

determine as a matter of law whether or not the conduct was outrageous before submitting that question to the jury.").

Plaintiff has not shown that Defendants' conduct was sufficiently outrageous or intolerable so as to support a reasonable finding of outrage or intentional infliction of emotional distress. See, e.g., Hainer v. American Medical Int'l, Inc., 492 S.E.2d 103, 109 (S.C. 1997)(Supreme Court affirmed trial court's directed verdict against plaintiff on her outrage claim, holding that her allegation that a hospital wrongfully reported her misconduct to a state disciplinary agency, even if the report was filed in bad faith and with malice, did not rise to the level of outrage); Barber, supra, (no outrageous conduct where employee, who was accused of theft and later terminated, was subjected to forty-minute meeting where his supervisor was verbally abusive, causing him to cry and to spend the entire weekend after the incident in bedroom and to contemplate suicide); Gattison v. South Carolina State Coll., 456 S.E.2d 414 (S.C. Ct. App. 1995)(mere "unprofessional and inappropriate" conduct did not exceed all possible bounds of decency); Corder v. Champion Road Machinery Int'l Corp., 324 S.E.2d 79 (S.C. Ct. App. 1984)(mere retaliatory discharge for filing worker's compensation claim, absent claims of verbal assaults or hostile, abusive encounters, did not rise to level required for tort of outrage), cert. denied, 332 S.E.2d 533 (S.C. 1985); Brown v. Pearson, 483 S.E.2d 477, 485 (S.C.Ct. App. 1977)(plaintiffs' allegations, that a church covered up allegations of sexual abuse, did not establish a jury question). Further, Plaintiff has not presented any evidence of emotional distress so severe that no person could be expected to endure it.

(5)     Negligent Infliction of Emotional Distress (Count XI)

Plaintiff alleges that Defendants' conduct also constituted negligent infliction of emotional distress.   Defendants contend that this claim is barred by the S.C. Workers'

Compensation Act's exclusive remedy provision and is barred by the SCTCA as to the individual Defendants.

Plaintiff fails to establish a claim for negligent infliction of emotional distress. South Carolina law generally requires proof of physical injury for the recovery of mental anguish and emotional distress. <u>See</u> <u>Phillips v. United States</u>, 575 F.Supp. 1309, 1317 (D.S.C.1983)("'[E]motional distress is a proper element of tort damage as long as such distress encompasses some physical manifestation.'" (quoting <u>Robertsen v. State Farm Mut. Auto. Ins. Co.</u>, 464 F.Supp. 876, 883 n. 9 (D.S.C.1979)). Here, Plaintiff has not shown any physical injury as a result of Defendants' alleged conduct. South Carolina courts have allowed claims for negligent infliction of emotion distress which are limited to claims of bystander liability. <u>Doe v. Greenville County School Dist.</u>, 651 S.E.2d 305, 307 (S.C. 2007). To establish a claim for negligent infliction of emotional distress a plaintiff must establish: defendant's negligence caused death or serious injury to another, plaintiff was a bystander in close proximity to the accident, plaintiff and the victim were closely related, plaintiff witnessed the incident and plaintiff must exhibit physical manifestations of emotional distress that can be established by expert testimony. <u>Kinard v. Augusta Sash & Door Co.</u>, 336 S.E.2d 465, 467 (S.C.1985). Plaintiff has not shown bystander liability.

(6)    Unjust Enrichment (Count XII)

Plaintiff appears to allege that the University was unjustly enriched because she performed unpaid work to rectify Defendants' grant fraud, she received a lower yearly salary than Kim even though she possessed far superior credentials and provided far superior work, and other benefits were accepted by Defendants for which commensurate compensation was not rendered.

34

Defendants contend that they are entitled to summary judgment because Plaintiff was paid for every semester she worked and she received $4,000 to work on the grant.

In South Carolina, to recover for unjust enrichment the plaintiff must show: "(1) that he conferred a non-gratuitous benefit on the defendant; (2) that the defendant realized some value from the benefit; and (3) that it would be inequitable for the defendant to retain the benefit without paying the plaintiff for its value." Sauner v. Public Serv. Auth. of S.C., 581 S.E.2d 161, 167 (S.C. 2003). Plaintiff fails to show that she conferred a non-gratuitous benefit on Defendants. She testified that she received a salary of $50,000 per year for nine months of teaching, she received additional pay if she taught summer courses, and she received payment from a grant in relation to the Library of Medicine. She stated that she received the money in September of 2005, but that it was for forthcoming work. Plaintiff Dep. 26-28

(7)     Wrongful Termination (Count XV)

Plaintiff appears to allege that he was wrongfully terminated in violation of public policy. AC at 37. Defendants contend that Plaintiff may not maintain such a claim because she had other statutory remedies (including Whistleblower Act, Title VII retaliation, 42 U.S.C. § 1983) see Dockins v. Ingles Markets, Inc., 413 S.E.2d 18 (S.C. 1992).

"Where the retaliatory discharge of an at-will employee constitutes violation of a clear mandate of public policy, a cause of action in tort for wrongful discharge arises." Ludwick v. This Minute of Carolina, Inc., 337 S.E.2d 213, 216 (S.C. 1985). In Ludwick, the employee was discharged from her employment because she chose to testify before the South Carolina Employment Security Commission (and avoid criminal penalties for failing to testify) pursuant to a subpoena. Id. at 214, 216. The Fourth Circuit has stated that the Ludwick exception is to be narrowly applied.

Merck v. Advanced Drainage Systems, 921 F.2d 549, 554 (4th Cir. 1990). The South Carolina Supreme Court has only recognized public policy claims in cases where an employer forced an employee to violate the law such as in Ludwick, or the termination itself was a violation of criminal law such as in Culler v. Blue Ridge Elec. Coop., Inc., 422 S.E.2d 91 (S.C. 1992).  Additionally, in Epps v. Clarendon County, 405 S.E.2d 386 (S.C. 1991), the Supreme Court of South Carolina declined to extend the public policy exception of Ludwick where an employee already had "an existing remedy for a discharge [Epp's claim that he had been terminated in violation of his constitutional right to free speech and association was actionable under 42 U.S.C. § 1983] which allegedly violates rights other than the right of employment itself."  Id. at 387, see also Lawson v. South Carolina Dep't of Corrs., 532 S.E.2d 259, 261 (S.C. 2000)(where statute creates a substantive right and provides a remedy for infringement of that right, the plaintiff is limited to that statutory right); Dockins v. Ingles Markets, Inc., 413 S.E.2d 18, 19 (S.C. 1992).     Here, Plaintiff fails to show that the public policy theory should apply because she has not shown that Defendants forced her to violate the law or that her termination itself was in violation of criminal law.

### CONCLUSION

Based on the foregoing, it is recommended that Defendants' motion to dismiss and for summary judgment (Doc. 50) be **granted**.

Joseph R. McCrorey
United States Magistrate Judge

August 20, 2010
Columbia, South Carolina